UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC TOBIAS WOODS,

        Petitioner,

v.
                                   Case Number: 06-CV-13741
                                   Honorable George Caram Steeh

KENNETH T. MCKEE,

        Respondent,

_____/

## OPINION AND ORDER
## DENYING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Eric Tobias Woods, a Michigan prisoner currently incarcerated at the Standish Maximum Correctional Facility in Standish, Michigan,[1] through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Woods was convicted by a Michigan Wayne County Circuit Court jury of (1) first-degree premeditated murder in violation of MICH. COMP. LAWS § 750.316, (2) felon in possession of a firearm in violation of MICH. COMP. LAWS § 750.224f, and, (3) felony firearm in violation of MICH. COMP. LAWS § 750.227b. He was sentenced to (1) life imprisonment without the possibility of parole for the first-degree-murder conviction, (2) a concurrent term of one-year to five-years imprisonment for the felon-in-possession conviction and, (3) a consecutive two-year term of imprisonment for the felony-firearm conviction.

Woods raises nine issues in his habeas petition, alleging that he is incarcerated in violation of his constitutional rights. Respondent has filed an answer to the petition, asserting that Woods's claims lack merit for the following reasons: (1) the decision of the Michigan Court of Appeals

---

[1]Petitioner was incarcerated at the Bellamy Creek Correctional Facility in Ionia, Michigan, when he originally filed this petition.

regarding claims I, IV, V, VI, and VIII did not result in an objectively unreasonable application of clearly established Supreme Court law, (2) claims II, VII, and IX are not cognizable in a habeas-corpus proceeding, and (3) claim III is procedurally defaulted. This Court agrees. Therefore, the petition will be denied.

## I. Substantive Facts

This case arises from an incident that occurred on April 24, 2000, on Fenmore Street in Detroit, Michigan. The trial however did not commence until January 9, 2003. Prior to trial, defense counsel filed a motion challenging the admissibility of Petitioner's confession, alleging that it was the product of police coercion and that the interrogating officers, Special Agent Mike Yott, of the Bureau of Alcohol, Tobacco, and Firearms Division, and Wayne County Deputy Sheriff Bruce Christnagel, refused Petitioner's request to confer with counsel. After a two-day-evidentiary hearing, the trial court ruled that Petitioner's confession was voluntary. Additionally, the trial court found that Petitioner had failed to request counsel. Against that backdrop, the trial court denied Petitioner's motion to suppress his confession.

The prosecution's theory at trial was that Woods and his friends, brothers Antrimone "Terry" Mosley and Sorrell "Reddy" Mosley, were friends of Courtney Irving, the victim in this case. According to the prosecution, the Mosley brothers were involved in a murder, on or about March 24, 2000, of an individual named Rene Hunter. The prosecution also posited that sometime early in 2000, the Mosley brothers were robbed of some marijuana and money; they suspected that Petitioner

was involved in that robbery.[2]  According to the prosecution, the Mosleys had put out a twenty-thousand-dollar contract on Petitioner's life.

Irving was also Petitioner's friend as well as Hunter's friend.  It was the prosecution's position that Irving knew that the Mosleys were involved in Hunter's murder and was about to give that information to the police.  As a result of having that knowledge, the Mosleys told Petitioner that if he killed Irving, then his life would be spared.  According to the prosecution, consequently, the Mosleys orchestrated Irving's murder.

It was theorized that Terry Mosley and another man, known as "Black," ran into Petitioner on the night in question.  Petitioner got into Black's car, a black Taurus, with Black driving, and was given a gun by Terry Mosley, who was driving a light-colored Cutlass.  Petitioner and Black then drove around the area in Black's car.  Subsequently, Terry Mosley called Petitioner and told him the whereabouts of Irving.  Black and Petitioner then drove to that area; Petitioner allegedly shot into the windshield of Irving's car approximately thirteen times.  Six of those bullets hit Irving but none killed him.  As Terry Mosley drove up to that same area, specifically to Irving's car, Irving exited his vehicle and jumped into the passenger side of Mosley's car.  Both vehicles then drove to Fenmore Street, where they stopped.

On Fenmore Street, as Irving exited Mosley's vehicle, Petitioner allegedly shot him again in the chest.  Both cars then drove away, leaving Irving lying on the ground on Fenmore Street.  Shortly afterward, Terry Mosley called Petitioner to tell him that Irving was not dead.  In response, Petitioner and Black drove back to Fenmore Street, where Petitioner exited the vehicle, walked up

---

[2]Another individual, Maurice Sutherland, whom the Mosleys also suspected was involved in the robbery with Petitioner, was killed in the summer of 2000.

to Irving, who was lying on the ground, and shot him at point-blank range, in the back of the head. Because there was a lack of sufficient evidence at the time of the incident, the case was dormant until 2002.

Then, on March 28, 2002, Special Agent Yott was working with Detroit Police Officer George Harris and Officer Christnagel on "Operation Second Shot," which was organized to investigate unsolved homicides or "cold cases." Subsequently, two years after the Irving shooting, Agent Yott and Officer Harris interviewed three witnesses–Erica Norris, Portia Bennett, and Doretha Norris. From the photo arrays that were shown to them, two witnesses immediately identified Petitioner as the shooter, Erica Norris and Doretha Norris; Ms. Bennett also identified Terry Mosley as the man in the white car. Both Erica and Doretha Norris made no identifications on the first photo array that they were shown, but on viewing the second array, they identified Petitioner as the shooter. Those identifications were done separately. Agent Yott and Officer Christnagel then arrested Petitioner, who gave a statement. In that statement, Petitioner admitted that he killed Irving and explained the Mosley brothers' involvement.

The trial in this case began on January 9, 2003. Irving's grandmother, Bobbie Irving, and his mother, Sabrina Irving, both testified that they knew Petitioner because he was Irving's friend. They also admitted to knowing Hunter and the Mosley brothers. Both identified Petitioner in court.

Erica Norris, one of the witnesses to the incident, testified next. She said that, on the day in question, April 23, 2000, Easter Sunday, she and her grandmother, Portia Bennett, were returning to her home on Fenmore Street, around midnight, when they saw a Cutlass parked in the middle of the street. According to her testimony, they saw two individuals standing next to her mother's car,

-4-

a van, which was parked in the driveway.  It was Erica Norris's testimony that the two guys waved at them, indicating that they go past them, but she said that they did not.  Rather, her grandmother pulled into the driveway.  According to her, as they pulled into the driveway, she heard one of the individuals say "I'm about to kill this mother f-----."  (Trial Tr. vol. II, 60, 62, Jan. 13, 2003.)

Erica Norris further testified that she subsequently observed Petitioner run to the passenger side of a black Taurus, enter the car, and exit, holding a long gun.  It was her testimony that she then saw Petitioner run to the passenger side of the white Cutlass, point the gun down and fire twice.  Erica Norris said that Petitioner then ran back to the Taurus and jumped into the passenger seat.  According to her, after the Taurus drove away, she got out of her grandmother's car and was then able to see the driver of the Cutlass, "eye to eye," before it pulled away.  (Trial Tr. vol. II, 67, Jan. 13, 2003.)  Erica Norris admitted that there was poor lighting in front of her house but she said that the lighting where the van was parked was good.

It was Erica Norris's testimony that following, she heard some sounds, which she realized were coming from the victim, who was lying on the ground, asking for help.  She said that both she and her grandmother attempted to help him.  As she ran to a neighbor's house, she testified that she saw the black Taurus return to the scene.  According to her, she then saw Petitioner exit the vehicle, point a gun at her grandmother, who was attempting to help the victim, and said "B---- go in the house, don't call the police."  (Trial Tr. vol. II, 70, Jan. 13, 2003.)  She testified that, as her neighbor was pulling her into the house (the neighbor's house), she then saw her grandmother run into her mother's house.  It was Erica Norris's testimony that when she looked out her neighbor's front window, she saw Petitioner shoot Irving in the head.

Erica Norris testified that she spoke to the police that night, relating to them the incident.

-5-

She said that she then had no further contact with the police until March 2002.  At that time, Agent Yott and Officer Harris came to her house and asked her to look at some pictures.  According to her, there were about six pictures in the first photo array and about eight pictures in the second photo array.  It was her testimony that she did not recognize any of the men in the first array of six photos.  However, in the second array of eight photos that she was shown, she identified Petitioner as the shooter that night.  According to her testimony, the police did not encourage or suggest that she pick out a certain individual.  Rather, she was left to her own and she identified Petitioner.

Portia Bennett also testified.  Ms. Bennett's testimony corroborated that of her granddaughter. Ms. Bennett testified that when she and her granddaughter arrived at her daughter's home on the night in question, she saw a light-colored vehicle in the middle of the street, partially blocking the driveway of her daughter's residence.  She said that as she was pulling into the driveway, she then saw a dark-colored car backing up toward her car, saw someone jump out of the car, take something from the trunk of the car, and run toward her and her granddaughter.  Ms. Bennett testified that her granddaughter then yelled to her that there was a man coming down the street with a gun.  It was Ms. Bennett's testimony that she then told her granddaughter and her three-year-old son, who was in the back seat, to get down.  Shortly after, Ms. Bennett said she heard some shots, heard the man running back to the car, and then, she heard both cars speeding away.

Further testimony from Ms. Bennett revealed that when she and her granddaughter got out of the car, they heard someone crying for help.  According to Ms. Bennett, they both ran toward the cries to try and help.  Ms. Bennett testified that she ran to her daughter's house, told her daughter to call 911, and then ran back to the victim, who was lying on the ground.  As she was talking to the victim, telling him that help was on the way, she heard a gun being cocked behind her head and the

words "get your mf'ing a– in the house, and stay in the house." (Trial Tr. vol. II, 163, Jan. 13, 2003.) It was Ms. Bennett's testimony that she believed that she was going to be shot in head. She said that she then saw her daughter standing on the curb, ran toward her, and the two of them then ran toward the house. Ms. Bennett testified that she heard one more gunshot but testified that she did not see the shooter.

According to Ms. Bennett's testimony, she talked to the police that night but had no further conversations with them until 2002, when two officers, Agent Yott and Officer Harris, came to her home and showed her some photographs. When shown the photo arrays by Agent Yott and Officer Harris, Ms. Bennett was able to identify Terry Mosley as one of the individuals who was at the scene of the shooting that night but was not able to identify Petitioner.

Doretha Norris, Erica Norris's mother and Ms. Bennett's daughter, was next to testify. She said that she was sleeping when she heard gunshots; she described them as close and loud. After hearing the gunshots, Doretha Norris said that she looked out her window and saw a light-colored car in the middle of the street and her mother's car in the driveway. She testified that she heard her mother yelling, telling her to call 911. According to Doretha Norris's testimony, she said that she then grabbed the phone and walked outside, where she saw a car, fast approaching down Fenmore Street, and her mother kneeling at the curb, directly across the street from her house. She described the car as a black or navy blue Sable or Taurus. It was her testimony that, after the car pulled up, a young man, carrying a long gun, exited, walked toward her pointing the gun, and said, "[h]ang up the mother f------ phone." (Trial Tr, vol. III, 22-24, Jan. 14, 2003.) According to Doretha Norris, the man then cocked the gun and pointed it at her mother, while ordering her back into the house. According to her testimony, they both then returned to the house. Doretha Norris said that

-7-

immediately afterward, she heard gunshots. It was Doretha Norris's testimony that following that incident, she and her mother went back outside, where they found the victim lying on the ground.

Subsequently, two years after the shooting, Agent Yott and Officer Harris came to her home and showed her two photo arrays; she identified Petitioner in the second of the two arrays.

On cross-examination, Doretha Norris admitted to being in a highly emotional state at the time of the incident. She testified that she was interviewed by the police on the night of the incident, where she described the shooter as a tall, dark, and thin individual. She admitted that the first time she saw Petitioner after the shooting was at the preliminary examination. When asked if she was able to identify Petitioner as the shooter at the preliminary examination, she was somewhat hesitant. However, at trial, her identification of Petitioner was unequivocal.

Over objection, Officer Harris testified as to the photographic line-ups that he and Agent Yott conducted with Erica Norris and Ms. Bennett. He testified that Erica Norris looked at the first photo array for about a minute and failed to identify anyone. It was his testimony that she immediately identified Petitioner in the second photo array. According to Officer Harris, when Ms. Bennett was shown the first photo array, she was unable to make an identification. However, when she was shown the second array, she immediately identified Terry Mosley as one of the individuals involved with the shooting on the night in question.

Leigh Hlavaty, an Assistant Medical Examiner for Wayne County, testified that she conducted the autopsy of Irving. It was her testimony that Irving had eight gunshot wounds on his body. According to Dr. Hlavaty's testimony, six of those wounds showed stippling abrasions, which are present when a bullet is fired through an intermediary object. It was also her testimony that the shot to the back of Irving's head was a contact wound, which was instantaneously lethal and which

was the only wound which showed signs of close-range firing.  Dr. Hlavaty concluded that the cause

of Irving's death was multiple gunshot wounds and that the manner of his death was homicide.

Detroit Police Officer Donna Babij, who was assigned to the evidence technician unit,

testified that she collected two R.M. Wolf 223 caliber shell casings which were found near Irving's

body.  According to her testimony, she was then directed to Fenmore Street, where she saw a gray

Malibu with thirteen bullet strikes to the front windshield and a shattered rear window.  Officer

Babij further testified that twelve additional R.M. Wolf 223 caliber shell casings were found near

the front of the vehicle; it was her conclusion that the shots had been fired from the front.

Officer David Pauch from the Detroit Crime Lab Firearms Identification Unit examined the

fourteen shell casings collected from the two locations and determined that they had all been fired

from the same weapon.

Sherif Elalayli, a Detroit Police Officer, who worked for the laser unit, testified that he was

responsible for recovering fingerprints from the evidence obtained at the crime scene.  It was his

testimony that no one requested that he, or anyone else in his department, look for fingerprints on

any of the cartridges that were retrieved at the scene of the shooting in this case.

Detroit Police Officer Gerald Thomas of the Homicide Unit, who, at the time,  was the

officer in charge of the investigation, testified as to the live line-up, which was conducted by another

officer on May 12, 2000.  Officer Thomas testified that, during that line-up, a witness, Kenneth

Sanders, who was believed to have some connection to the Irving shooting, identified Carl Frazier

from among the other four individuals, as the suspect.  In response to being asked what Mr. Frazier

had done, Mr. Sanders replied, "He was the shooter.  He is the one that pointed the gun at me."

(Trial

Tr. vol. IV, 30, Jan. 15, 2003.)  Further investigation revealed that Frazier was homeless; he was subsequently released.

Agent Yott testified next.   He testified that he became the officer in charge of the investigation in March 2002.  According to Agent Yott, he located Mr. Sanders as part of his initial investigation and acknowledged that Officer Harris had interviewed him.  It was his testimony that in his attempts to locate Mr. Frazier, he was only able to determine that he was homeless; Agent Yott was never able to contact Mr. Frazier.  Further investigation also revealed that Mr. Sanders was homeless and that the two were involved in an oral dispute over where to sleep.  As a result, Agent Yott decided not to pursue the investigation as to Mr. Frazier.

Agent Yott also testified that initially, he reviewed the statements of Erica Norris and Portia Bennett, and determined that their description of the events of that night were almost identical. Subsequently, he contacted the Irving family and conducted an interview of them.  It was his testimony that he then visited the homes of Erica and Doretha Norris and Portia Bennett, along with Officer Harris, in order to conduct a photographic line-up.  According to Agent Yott's testimony, Erica Norris identified Petitioner from the second photographic array.  Agent Yott further testified that he subsequently proceeded to show the photographic arrays to Doretha Norris.  It was his testimony that Doretha Norris failed to identify anyone from the first array but that, after a brief hesitation at looking at the second photo array, she identified Petitioner as the shooter.  According to Agent Yott, the interviews were conducted separately.

Agent Yott then proceeded to Ms. Bennett's home.  It was his testimony that Ms. Bennett failed to identify anyone from the first photo array but when shown the second array, she was able

to identify Terry Mosley, as being one of the individuals in the driveway when she pulled up.

During Agent Yott's testimony, defense counsel alerted the trial court to the fact that in the Interrogation Report done by Agent Yott, while he was questioning Petitioner, reference was made to the tattoo on Petitioner's forearm, which was an image of an AR-15 assault rifle surrounded by the inscription "Real Niggas Don't Talk." (Trial Tr. vol. IV, 69-70, Jan. 15, 2003.) Defense counsel motioned the trial court to preclude the mentioning of the tattoo or the inscription as evidence because of its prejudicial character. The trial court ruled that the words were prejudicial and precluded such evidence. However, the trial court permitted the admissibility of the image contained within the tattoo.

Agent Yott then continued with his testimony as to his interrogation of Petitioner and the statement that Petitioner made to him. The following is Agent Yott's testimony, regarding that statement.

In his statement, Petitioner told Agent Yott that about ten or eleven days before the shooting, Reddy Mosley informed him that there was a twenty-thousand-dollar contract out to kill him. Petitioner did not explain why the contract existed. However, according to what Petitioner told Agent Yott, Reddy Mosley told him that he did not have to "go out" like Hunter. Petitioner understood that to mean that he did not have to be killed as Hunter had been. Petitioner claimed that Terry Mosley told him that Irving had some information linking the Mosley brothers to Hunter's murder. Because Terry Mosley believed that Irving was prepared to approach the police with that information, he suggested that the contract on Petitioner's life could be cancelled in exchange for killing Irving.

It was Agent Yott's testimony that Petitioner maintained that, on the day of the shooting,

-11-

Terry Mosley gave him a gun and a man named "Black" picked him up in a black Taurus. Petitioner explained to Agent Yott that they then approached Irving's car, blocking it between their car and Terry Mosley's white Cutlass. Petitioner told Agent Yott that he got out of the car and shot Irving through the windshield. He said Irving then got out of his own car and into Terry Mosley's car. Both cars drove to the second location, where Petitioner told Agent Yott that he again shot Irving. Petitioner told Agent Yott that they left Irving at that location.

According to Agent Yott, Petitioner said that shortly afterward, Terry Mosley called him and told him that Irving was still alive. Petitioner told Agent Yott that he then returned to the area and shot Irving in the back of the head, killing him. Petitioner claimed that the following day Terry Mosley told him to keep his mouth shut and he would be "straight," which Petitioner understood to mean that the contract to kill him was cancelled. (Trial Tr. vol. IV, p. 112, Jan. 15, 2003.) Petitioner signed the bottom of each page of the statement and initialed the corrections made.

Investigator Christnagel also testified. His testimony corroborated that of Agent Yott.

At the close of the prosecution's case-in-chief, Petitioner's counsel motioned the trial court for a directed verdict, which was denied. Petitioner then proceeded to present an alibi defense to the jury. Two alibi witnesses testified that they were with Petitioner at a hair show in Detroit, Michigan, when Irving was killed. Sherry Kahari, Petitioner's cousin, testified first.

According to Ms. Kahari, on April 23, 2000, there was a hair show at the State Theater in Detroit, Michigan, which she attended. It was her testimony that she saw Petitioner, sitting in the VIP section, with his brother Randall Woods, and another individual named Damon. Ms. Kahari testified that she left the theater, sometime between 10:45 and 11:00 p.m., that night and that Petitioner and the other two men remained at their table.

-12-

Randal Woods, Petitioner's brother, testified next. Mr. Woods corroborated Ms. Kahari's testimony in that, he, Petitioner, and Petitioner's friend, Damon Hicks, attended the hair show at the State Theater in Detroit on the night in question. It was his testimony that they left the State Theater about 12:30 p.m., that night and went to his apartment, an apartment that he shared with his girlfriend, Desiree Garcia, in Southfield, Michigan. According to his testimony, the three of them played video games until 3:00 a.m., when they all went to sleep. Mr. Woods testified that no one left the apartment during that time. Through Mr. Woods's testimony, a photograph of the three men taken at the hair show was introduced into evidence. There was no actual date on the photograph itself but Mr. Woods testified that the photograph was taken around 11:45 p.m., that night.

On cross-examination, Mr. Woods testified to knowing Irving and Hunter. He denied knowing the Mosley brothers. Mr. Woods also admitted to having a professional relationship with defense counsel. Mr. Woods further testified that he never visited his brother while he was in jail but that he did have telephone conversations with him.

Damon Hicks also testified for the defense. He corroborated the testimony of Mr. Woods and Ms. Kahari and also admitted to having a professional relationship with defense counsel. On cross-examination, Mr. Hicks also admitted to knowing Irving and Hunter but denied knowing the Mosley brothers.

Desiree Garcia, Randall Woods's girlfriend at the time, also testified for the defense. According to her testimony, she left their apartment that day sometime in the early afternoon and returned home at approximately 1:30 a.m. It was her testimony that when she returned home, she saw Randall Woods, Damon Hicks, and Petitioner playing video games in the apartment. Ms. Garcia testified that she went to sleep between 2:00 or 2:30 a.m., and when she woke the next day

-13-

at approximately 10:00 or 11:00 a.m., all three men were still in the apartment.

Petitioner testified on his own behalf. He denied having shot Irving. According to Petitioner's testimony, he attended the hair show on the night in question with his brother and friend, Damon Hicks, from about 8:00 p.m. to 12:45 a.m. He said that, after they left the hair show, they went to Ms. Garcia's apartment, where he spent the night. Although he admitted signing the statement that he gave to Agent Yott, he claimed that he had been forced to sign it under psychological duress. It was Petitioner's testimony that Agent Yott made him believe that the case against him was unbeatable, that he would be spending the rest of his life in prison, and that he would never see his child or his mother again. Petitioner also said that Agent Yott told him that he would intervene on his behalf with the prosecuting attorney and that he would face no more than eight years in prison instead of life. Petitioner further testified that Agent Yott told him that they were going to "build him a defense" to the murder charges, and that "[w]e are going to say that unless you killed Courtney you would be killed[] yourself." (Trial Tr. vol. VI, p. 24, Jan. 21, 2003.)

Subsequently, the jury convicted Petitioner of the above-stated charges.

## II. Procedural History

Following his convictions and sentences, Woods, through counsel, filed a first right of appeal with the Michigan Court of Appeals, raising the following claims:

> I.   The prosecutor committed reversible error when he inquired of two alibi witnesses whether or not a professional relationship existed between then and defense counsel.

> II.  The trial court abused its discretion when it refused to permit the calling of [Petitioner's] father as a witness for the defense.

> III. The trial court abused its discretion when it allowed into evidence proof of [Petitioner's] tattoo and inscription.

-14-

       A.     The prosecutor committed reversible error during his rebuttal closing argument.

IV.    The officer in charge committed reversible error when he deliberately referred to the need for [Petitioner] to testify.

       A.     The same officer also impermissibly commented on [Petitioner's] silence.

V.    The trial court abused its discretion when it allowed into evidence third-party testimony concerning a two-year old identification.

VI.    The trial court abused its discretion when it refused to declare a mistrial despite having given a cautionary instruction.

       A.     The prosecutor's rebuttal argument enhanced the prejudicial nature of the error upon which a mistrial was sought.

VII.    The trial court abused its discretion when it allowed testimony of drug theft into evidence.

VIII.    The trial court abused its discretion when it permitted the prosecutor to impermissibly bolster eyewitness testimony.

IX.    The errors complained of violated [Petitioner's] right to due process of law under both the Michigan and Federal Constitutions.

On September 28, 2004, the Michigan Court of Appeals affirmed Woods's convictions and sentences. *People v. Woods*, No. 247306, 2004 WL 2177180 (Mich.App. Sept. 28, 2004) (unpublished). Woods then filed an application for leave to appeal with the Michigan Supreme Court, raising the same claims. The Michigan Supreme Court denied the application on May 31, 2005. *People v. Woods*, 472 Mich. 914, 696 N.W.2d 723 (2005).

Woods's petition for a writ of habeas corpus was filed with this Court on August 23, 2006. In his petition, Woods raises the following issues:

-15-

I.      The Petitioner's Sixth and Fourteenth Amendment Due Process rights to a fair trial were violated where the Petitioner was not permitted to call his father as a rebuttal witness at trial, thereby effectively denying him a valid alibi defense.

II.     The Petitioner's Fifth and Fourteenth Amendment Due Process rights to a fair trial were violated where the trial court allowed introduction of Petitioner's tattoo and inscription into evidence.

III.    The Petitioner's Fifth and Fourteenth Amendment Due Process rights to a fair trial and privilege against sel-incrimination were violated where the officer in charge deliberately referred to the need for the Petitioner's testimony and impermissibly commented on his post-*Miranda* silence.

   A.   Petitioner's need to testify.

   B.   Petitioner's post-*Miranda* silence.

   C.   Harmless error.

IV.     The Petitioner's Fifth and Fourteenth Amendment Due Process rights to a fair trial were violated where the trial court erroneously permitted into evidence third-party police testimony concerning the extrajudicial identification of the Petitioner.

V.      The Petitioner's Fifth and Fourteenth Amendment Due Process rights to a fair trial were violated where the trial court erroneously permitted the prosecutor to bolster eyewitness testimony.

VI.     The Petitioner's Fifth and Fourteenth Amendment Due Process rights to a fair trial were violated where the trial court refused to declare a mistrial after a witness referred to the Petitioner as a "[k]iller."

VII.    The Petitioner's Fifth and Fourteenth Amendment Due Process rights to a fair trial were violated where the trial court erroneously permitted the introduction of an uncharged, unsupported drug theft into evidence.

VIII.   The Petitioner's Fifth and Fourteenth Amendment Due

Process rights to a fair trial were violated where the prosecutor engaged in prosecutorial misconduct.

    A.    The prosecutor inquired of two alibi witnesses whether a professional relationship existed between them and defense counsel.

    B.    The prosecutor commented on unproven allegations of drug and money theft in his closing argument.

    C.    The prosecutor impermissibly commented on the Petitioner's tattoo in his rebuttal closing argument.

    D.    The prosecutor commented on a witness's fear of the Petitioner in his rebuttal closing argument.

IX.    The cumulative effect of the above mentioned trial errors resulted in the denial of the Petitioner's due process right to a fair trial.

### III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs  habeas corpus review of state court decisions.  28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under the "contrary to" clause of § 2254(d)(1), a federal court may grant a writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has decided

-17-

an issue on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts. *Id.* at 407-08. Relief is also available if the state-court decision unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state-court decision was "objectively unreasonable." *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state-court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

With that standard in mind, the Court proceeds to the merits of the petition for a writ of habeas corpus.

## IV. Discussion

### A. Claim I–Right to Present a Defense

In his first claim, Woods contends that his right to present a defense was violated when the trial court did not allow him to recall his father to the stand.

"A fair opportunity to present a defense is a constitutional right," *Baze v. Parker*, 371 F.3d 310, 323 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005) (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), and "presenting relevant evidence is integral to that right." *Id.* (citing *Taylor v. Illinois*,

484 U.S. 400, 408-09 (1988)); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

(quoting *Crane*). It is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410

U.S. 284, 294 (1973). The Supreme Court has described the basic ingredients of due process of law.

It has stated in pertinent part:

> A person's right to reasonable notice of a charge against him, and an
> opportunity to be heard in his defense–a right to his day in court–are
> basic in our system of jurisprudence; and these rights include, as a
> minimum, a right to examine the witnesses against him, to offer
> testimony, and to be represented by counsel.

*Washington v. Texas*, 388 U.S. 14, 18 (1967) (quoting *In re Oliver*, 333 U.S. 257 (1948)).

Further, the Supreme Court described the right to present a defense as follows:

> The right to offer testimony of witnesses, and to compel their
> attendance, if necessary, is in plain terms the right to present a
> defense, the right to present the defendant's version of the facts as
> well as the prosecution's to the jury so it may decide where the truth
> lies. Just as an accused has the right to confront the prosecution's
> witnesses for the purpose of challenging their testimony, he has the
> right to present his own witnesses to establish a defense. This right
> is a fundamental element of due process of law.

*Washington*, 388 U.S. at 19.

This right, however, is not absolute and states have broad authority to promulgate rules that

exclude evidence so long as they are not arbitrary or disproportionate to purposes they are designed

to serve. *United States v. Scheffler*, 523 U.S. 303, 308 (1998). The exclusion of evidence is

unconstitutional where it "infringe[s] upon a weighty interest of the accused." *Id.* (citing *Rock v.

Arkansas*, 484 U.S. 44, 58 (1987)); *see also Spisak v. Mitchell*, 465 F.3d 684, 692 (6th Cir. 2006).

In determining whether the exclusion of evidence infringes upon a weighty interest of the

accused, the court's role is not to determine whether the excluded evidence would have caused the

jury to reach a different result. *Davis v. Alaska*, 415 U.S. 300, 317 (1973). Instead, the question is

-19-

whether the defendant was afforded "a meaningful opportunity to present a complete defense."
*Crane*, 476 U.S. at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).   The
prosecutor's case must "encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.*
at 690-691 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

Here, the last state court to issue a reasoned decision in this case, the Michigan Court of
Appeals, stated in pertinent part:

> Next, [petitioner] argues that the trial court erroneously
> precluded him from calling his father as a witness.   The decision
> whether to admit evidence is within the discretion of the trial court
> and will not be disturbed on appeal absent an abuse of discretion.
> *People v. Katt*, 468 Mich. 272, 278; 662 NW2d 12 (2003).   Even if
> relevant, evidence may be excluded under MRE 403 "if its probative
> value is substantially outweighed by the danger of unfair prejudice,
> . . . or by considerations of undue delay, [or] waste of time[.]"
>
> [Petitioner's] brother testified, providing an alibi for
> [petitioner]. During cross-examination, [petitioner] denied that his
> brother visited him in jail while he was awaiting trial, but admitted
> talking with his brother on the telephone.   The prosecutor then
> attempted to impeach [petitioner] with the fact that a Randall Woods
> had signed in and visited him in jail. [Petitioner] testified that it was
> his father, not his brother, who visited him.   During redirect
> examination, [petitioner] again claimed that it was his father, not his
> brother, who visited him at the jail.   Although [petitioner]
> subsequently sought to call his father to show that it was his father,
> not his brother, who visited him at the jail, the import of the
> prosecutor's cross-examination was only to show that [petitioner] had
> pretrial contact with his brother, who testified in support of
> [petitioner's] alibi defense.   Because [petitioner] admitted speaking
> to his brother while awaiting trial, whether [petitioner's] father also
> visited [petitioner] in jail was not a material issue.   Accordingly, the
> trial court did not abuse its discretion by precluding [petitioner]
> from calling his father as a witness on the basis that to do so would be a
> waste of judicial time.   MRE 403.

*Woods*, No. 247306, 2004 WL 2177180, slip op. at 3.

In this case, the Court finds that the Michigan Court of Appeals did not unreasonably apply

-20-

clearly established Supreme Court precedent to the facts of this case regarding this issue. The state court of appeals correctly found that this "was not a material issue." *Woods*, No. 247306, 2004 WL 2177180, slip op. at 3. It was irrelevant whether Petitioner spoke to his brother in person or by telephone. Furthermore, defense counsel requested that a cautionary instruction be given to the jury. The trial court agreed. The Michigan Court of Appeals's decision regarding this issue was not an unreasonable application of clearly established Supreme Court precedent. Woods is therefore not entitled to habeas relief on this claim.

### B. Claims II, VII, and IX–Admission of evidence regarding Petitioner's tattoos and prior acts and cumulative errors in general

Petitioner alleges that the admission of the evidence regarding his tattoos, his prior acts, and, the accumulation of the alleged errors, in general, all rendered his trial unfair. However, errors of state law do not provide a basis for habeas relief.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal-habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness,

-21-

it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also Foley v. Parker*, 488 F.3d 377, 394 (6th Cir. 2007) (amended opinion).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, "[T]he Supreme Court has defined 'very narrowly' the category of infractions that violates 'fundamental fairness.'" *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). State-court-evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

The Michigan Court of Appeals, the last court to issue reasoned decisions on these issues, stated:

> Next, [petitioner] argues that the trial court abused its discretion by permitting testimony of [petitioner's] tattoo, an assault rifle and the inscription, "Real Ni-as Don't Talk." During the prosecutor's case-in-chief, the trial court ruled that evidence of the tattoo could be admitted, but excluded evidence of the inscription because of its offensive nature. Subsequently, during cross-examination of [petitioner], the prosecutor sought to elicit testimony that [petitioner] killed the victim because he was a "snitch." [Petitioner] denied that it was his "philosophy that real men don't snitch." Following a sidebar conference, the prosecutor questioned [petitioner] about the inscription, "Real Ni-as Don't Talk."

> We reject [petitioner's] claim that the prosecutor improperly cross-examined him about the tattoo inscription. Although the trial court had previously ruled that the offensive language was not admissible in the prosecutor's case-in-chief, where a [petitioner] elects to testify, evidence deemed inadmissible in a prosecutor's case-in-chief may become relevant and admissible to the [petitioner's] credibility. *People v. Ford*, 59 Mich.App 35, 45; 228 NW2d 533 (1975). *See also People v. D'Angelo*, 401 Mich. 167, 178; 257 NW2d 655 (1977). Relevant evidence is any evidence that has a tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. MRE 401.

-22-

During cross-examination, [petitioner] denied subscribing to a philosophy that "real men don't snitch." The tattoo inscription was relevant to rebut the credibility of [petitioner's] testimony. Moreover, it was relevant to [petitioner's] intent and motive in light of evidence that the victim was shot because he had information about the Mosleys' involvement in the death of Rene Hunter and that he was prepared to go to the police with this information. To the extent the tattoo inscription could be deemed prejudicial because of its offensive nature, in light of the trial court's cautionary instruction advising the jury on the limited purpose of the evidence, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. MRE 403.

Furthermore, the trial court did not abuse its discretion when it originally ruled that the tattoo of the assault rifle was admissible under MRE 401 and MRE 403. The prosecutor presented evidence that the victim was shot with an assault-type rifle, and the tattoo was probative of [petitioner's] familiarity with such a weapon. The trial court's cautionary instruction reduced the potential for any unfair prejudice under MRE 403.

We also disagree with [petitioner's] claim that the prosecutor's references to the tattoo during rebuttal argument were improper because they exceeded the scope of defense counsel's closing argument. MCR 6.414(E). Although defense counsel did not directly refer to the tattoo or inscription during his closing argument, he characterized Agent Yott as an experienced investigator who was "capable of either threatening, cajoling, promising, or doing whatever is necessary to get this cold case solved," and of employing "psychological tricks" and threats to extract [petitioner's] confession. Defense counsel further argued that Agent Yott's testimony about [petitioner's] interrogation was not credible. The challenged rebuttal remarks were made in response to defense counsels attacks on Agent Yott's credibility, and to rebut defense counsel's suggestion that [petitioner's] version of what occurred during the interrogation was

more credible. Considered in this context, we conclude that the trial court did not abuse its discretion in allowing the prosecutor's argument.

* * *

[Petitioner] argues that the trial court abused its discretion

-23-

when it allowed the prosecutor to elicit testimony from Agent Yott about the theft of a large amount of narcotics and money as an explanation for why a "contract" may have been placed on [petitioner's] life. During cross-examination, defense counsel asked Agent Yott if he had found any information that corroborated whether a contract on [petitioner's] life existed, and Agent Yott answered, "no." During redirect examination, the prosecutor asked Agent Yott whether he had any information that explained why there might be such a contract. Agent Yott explained that a large amount of narcotics and money had been stolen from Reddy Mosley earlier in 2000, before the victim in this case was killed.

In light of the prosecution's theory that [petitioner] killed the victim in order to remove the contract on his life, which was consistent with the explanation that [petitioner] gave the police, Agent Yott's testimony was relevant under MRE 401. Furthermore, the prosecutor's questioning was responsive to defense counsel's cross-examination of Agent Yott on this subject. Moreover, to the extent the prosecutor's questioning could be considered improper, by opening the door to the challenged testimony, [petitioner] invited the error. Under the "invited-error doctrine," appellate review is precluded because, when a party invites the error, he waives his right to seek appellate review, and any error is extinguished. *People v. Jones*, 468 Mich. 345, 352 n 6; 662 NW2d 376 (2003).

\* \* \*

Finally, there is no basis to conclude that [petitioner] was denied a fair trial because of the cumulative effect of several insignificant errors. Cumulative error, properly understood, "actually refers to cumulative unfair prejudice, and is properly considered in connection with issues of harmless error. Only the unfair prejudice of several actual errors can be aggregated to satisfy the standards set forth in *People v. Carines*, 460 Mich. 750, 774; 597 NW2d 130 (1999)." *People v. LeBlanc*, 465 Mich. 575, 591-592, n 12; 640 NW2d 246 (2002) (emphasis in original). Because we have found no prejudice, "this issue is without merit." *People v. Werner*, 254 Mich.App 528, 544; 659 NW2d 688 (2002).

*Woods*, No. 247306, 2004 WL 2177180, slip op. at 2-6.

Here, the Court finds that the Michigan Court of Appeals's decision regarding these issues is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

-24-

The Court of Appeals found that the state-court-evidentiary rulings were not so egregious so as to deny Petitioner's trial as fundamentally unfair, thus violating his due process rights and therefore warranting habeas relief. *Bugh*, 329 F.3d at 512; *see also Norris*, 146 F.3d at 328-29 (citing *Estelle*, 502 U.S. at 67-68). Furthermore, the Court of Appeals correctly noted that Woods failed to demonstrate that he was prejudiced by the admission of the evidence. And, in addressing claim two, the Court of Appeals also correctly noted that the trial court gave the jury a cautionary instruction advising them on the limited purpose of the tattoo evidence, thus reducing the unfair prejudice under M.C.R. 403. Thus, the Court finds that Woods is not entitled to habeas relief regarding these claims.

### C. Claim III–Comment on Petitioner's need to testify

In his third habeas claim, Woods alleges that his constitutional rights were violated when, on cross-examination, Agent Yott referred to his (Woods's) need to testify–that Petitioner's testimony would be the "best evidence." There was no objection to this testimony. As a result, the Michigan Court of Appeals reviewed this claim under the plain error standard. Therefore, this claim is barred by procedural default.

Federal-habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir.1991). A petitioner's procedural default in the state courts will preclude federal-habeas review if the last state court rendering a judgment in the case rested its judgment on the procedural default. *Wainwright*, 433 U.S. at 85; *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir.2001). In such a case, a federal court must determine not only whether a petitioner has failed to comply with state procedures but also whether the state court relied on the procedural default or, alternatively, chose to waive the procedural bar. "A procedural default

does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last explained state-court judgment should be used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state-court judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

However, a state prisoner who fails to comply with a state's procedural rules waives the right to federal-habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). To the extent that Woods attempts to establish cause to excuse his procedural default by claiming ineffective assistance of trial counsel for failing to object to the police officer's testimony, he does not do so. However, even assuming that he can establish cause to excuse his default, however, he cannot demonstrate actual prejudice; Woods's defaulted claim lacks merit and does not warrant habeas relief.

### D. Claim IV–Introduction of hearsay testimony

Petitioner alleges in his fourth claim that his rights were violated by the introduction of hearsay testimony regarding his identification by two witnesses that ultimately testified at trial and were therefore subjected to cross-examination. To the extent that Petitioner is alleging that the evidence admitted violated M.R.E. 8019d)(1)(C), he does not present a question that is cognizable

in this habeas-corpus action for the reasons stated in Section B, above.  In this case, the only possible basis for a constitutional claim would be an alleged Confrontation Clause violation. However, here, no such problem arises.  The hearsay evidence at issue involves a situation where the declarant also testified at trial and was therefore subject to full and unfettered cross-examination. In addressing this issue, the last court to issue a reasoned decision, the Michigan Court of Appeals stated:

> [Petitioner] contends that the trial court abused its discretion when it allowed Agent Yott to testify about two witnesses' identification of [petitioner] from a photograph array that they viewed two years after the shooting.  Because both witnesses testified at trial and were subject to cross-examination concerning the identifications, Agent Yott's third-party testimony was admissible under MRE 801(d)(1)(C).  *People v. Malone*, 445 Mich. 369, 371; 518 NW2d 418 (1994).

*Woods*, No. 247306, 2004 WL 2177180, slip op. at 5.

The Court finds that the introduction of the identification testimony in this case did not give rise to any Confrontation Clause problems under the United States Supreme Court precedent. *California v. Green*, 399 U.S. 149, 163-164 (1970).  The Michigan Court of Appeals's decision that, "[b]ecause both witnesses testified at trial and were subject to cross-examination concerning the identifications, Agent Yott's third-party testimony was admissible under MRE 801(d)(1)(C)," is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Woods*, No. 247306, 2004 WL 2177180, slip op. at 5 (citations omitted).  Against that backdrop, this Court finds that Petitioner is not entitled to habeas relief on this claim.

### E.  Claim V–VIII–Prosecutorial Misconduct Claims

In claims five through eight, Petitioner alleges that the prosecutor engaged in misconduct by (1) improperly bolstering witnesses credibility, (2) referring to Petitioner as a "dangerous man" in

-27-

his rebuttal argument, (3) asking alibi witnesses whether they had a prior business relationship with defense counsel, and, (4) referring to evidence regarding drugs, money, and Petitioner's tattoo during closing argument.

Prosecutorial misconduct must be so egregious as to deny the petitioner a fundamentally fair trial before habeas-corpus relief becomes available. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). In this regard, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Specifically, the Sixth Circuit takes into account "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury and the strength of the competent proof to establish the guilt of the accused." *Hamblin v. Mitchell*, 354 F.3d 482, 494-95 (6th Cir. 2003). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

The inquiry is directed to deciding whether the state court's determination of the issue was an unreasonable application of clearly established federal law. *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir.), *as amended on reh'g*, 348 F.3d 174 (2003), *cert. denied*, 124 S.Ct. 1825 (2004); *United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks in opening and closing statements and throughout trial were not cured by cautionary instructions); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to the community conscience was cured by instructions). The giving of cautionary instructions also factors into the calculus of determining whether fundamental fairness was denied. *Serra*, 4 F.3d at 1356. Extensive

-28-

prosecutorial misconduct during trial and during closing argument justifies the granting of a writ of habeas corpus. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

However, where the evidence pointing to the defendant's guilt is strong and the prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's guilt or innocence of the crime, the improper comments may be error but the jury would probably have returned the verdict of guilty anyway, and therefore, habeas relief is not warranted. *Hamblin*, 354 F.3d at 495.

The Sixth Circuit has adopted a two-step approach in order to determine whether a defendant is entitled to a new trial based upon improper prosecutorial remarks made in closing argument. *See United States v. Carroll*, 26 F.3d 1380, 1385-90 (6th Cir. 1994). First, the court should determine whether the remarks were improper by examining the context of the remarks and existing precedent. *Id.* at 1387-89. Second, it should determine whether the remarks were flagrant by applying the factors enunciated in *United States v. Leon*, 534 F.2d 667, 678-83 (6th Cir. 1976).

> Flagrancy is determined by an examination of four factors:
> "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused."

*Id. See also Boyle*, 201 F.3d at 717 (quoting *Carroll*, 26 F.3d at 549, 550). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).

The Michigan Court of Appeals in this case found no error in the instances of alleged prosecutorial misconduct outlined by Petitioner. This Court agrees and finds that the Michigan

Court of Appeals's decision is consistent with United States Supreme Court precedent and constitutes a reasonable application thereof.  (See Section B.)

Therefore, under the circumstances of this case, the prosecutor's conduct was not so egregious or flagrant as to deprive Petitioner of a fair trial.  Accordingly, Petitioner is not entitled to federal-habeas-corpus relief with respect to these claims.

### F.  Claim IX–Cumulative Effect Claim

Woods's final claim is that the cumulative effect of the above-stated trial errors denied him his due process rights to a fair trial.  Woods is not entitled to habeas relief on a cumulative error theory.  "[T]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447, (6th Cir. 2002), *opinion corrected on denial of rh'g*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

Against that backdrop, the Court finds that Woods is not entitled to habeas relief regarding his cumulative-effect-error claim.

### V.  Conclusion

The state-court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  Woods has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.


Dated:  March 24, 2009

                                        S/George Caram Steeh
                                        GEORGE CARAM STEEH
                                        UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
March 24, 2009, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk